We're now going to move to our final case of the day, Appeal 24-1297. This is Rabenhorst v. Mayorkas. We will begin with argument from the appellant by Mr. Smith. Mr. Smith, you may take the lectern. Michael Smith on behalf of the appellant, Carl Rabenhorst. We're here basically on a summary judgment being granted on a suspension that he had, which we believe was wrongful. This particular appellant actually was working for FEMA, but prior to that he'd been working with the Navy. He was actually on the Navy's Midwest Regional Anti-Terrorism Program Manager, and then Region 5 actually recruited him for the Anti-Terrorism Program Manager called REP, which is the Regional Emergency Preparedness, which is the REP program. Mr. Smith, hello. This was a summary judgment, so we can assume that Mr. Rabenhorst is right in asserting he was doing his job correctly, that O'Leary and the others were not complying with FEMA rules and procedures, and that his co-workers in Puerto Rico were incompetent. But what is the evidence that he did not engage in the misconduct he was disciplined for? For example, talking out of school with FEMA contractors, using abusive language, and behaving inappropriately vis-a-vis his co-workers in Puerto Rico. I think that's what we have to zero on in. Well, to answer that, basically he was considered with REMA, with the REP program, to be an expert, and then he was assigned out to do the job to protect the country, and that is to going and working with states and being ready for nuclear issues. And that's where the problem started, when he was actually on a site in Michigan, when they had a certification problem there, he was reprimanded because he actually demanded the staff there complete the certification compliance failures. And then in 2017, there was also a problem in Puerto Rico with the Hurricane Maria. But Mr. Smith, I didn't see anything in the record where you disputed that your client used profanity, complained about his boss to the contractors, contacted state officials directly when he was told not to. I didn't see anything where you're disputing those underlying facts. Is that fair? Because O'Leary basically didn't have the understanding of the record. No, that just, I want to make sure that I'm not missing something. You aren't disputing those underlying facts, correct? Correct. I mean, what we're saying is that in regards to O'Leary and my client's attempt to get him to comply with the different rep program guidelines, he refused. And so he would get in trouble with insubordination. And that goes to the official letter that he had sent to the one state asking them. Yeah, you argued that O'Leary was not performing his job. I understand that. But I just want to make sure I didn't miss something in the record with respect to those other facts. Well, I think we did address the fact that by trying to get O'Leary to understand the rep program, O'Leary refused to listen to him and sometimes even waived requirements under the rep program, which he didn't have authority to do. And because of his working with O'Leary, that's where he started getting reprimands. He got reprimanded by contacting the state, which was not doing anything to comply with their readiness. Because of that, O'Leary gave a waiver to them over the objections of my client. In Puerto Rico, he was assigned to a task of being prepared on Maria. And he was working with some DEI females who didn't understand the program, didn't understand some of the issues that are involved in being prepared. There was some catastrophes where somebody had to decide about having planes ready to bring supplies in. And it didn't happen. And he would complain. Because of that and the fact that there were temporary female workers there, they didn't want him being there. So they argued against him being there and he got transferred. I think the point is that the retaliation is clear, that based on his trying to make sure the United States is prepared for a nuclear disaster and that there are people working with FEMA that were totally unqualified, he was trying to do his job from having the naval experience. And he may have been a little gruff, but that comes from his having been in the Navy. I mean, there's a lot of certainly things that occur that somebody who's in an official capacity of a commander, seeing somebody that's not doing their job sometimes blurt something out, which is basically the frustration that somebody has when they don't understand the REP program and being prepared for the country to be protected. Would you like to reserve the remainder of your time? Yes, I'd like to reserve my time. Very good. Thank you, Mr. Smith. We'll now hear argument on behalf of the appellee, Ms. Phillip. May it please the Court, Mr. Smith. Mr. Rabenhorst was not disciplined because he was trying to get the agency to comply with various regulations regarding the Radiological Emergency Preparedness Program. FEMA disciplined Mr. Rabenhorst because his supervisors repeatedly told him not to engage in insubordinate, abusive, disrespectful, and disruptive conduct, and he kept doing so. In March of 2016, he was reprimanded because he emailed the Michigan State Attorney General without FEMA's authorization to criticize the interpretation of state law. And in that March 2016 reprimand, he was reminded that he had previously been verbally counseled twice in 2015 and warned for sending exceedingly aggressive and argumentative emails. A year after the March 2016 reprimand, he was reprimanded again for an argument with Ohio Emergency Management Agency officials where he asked, does anyone here speak English? And when no one responded, he said, this is bullshit. His misconduct resulted in his removal as a FEMA Ohio site specialist at the Ohio official's request. Two months after that, during the Monticello exercise, he told a contractor that his supervisor, Mr. O'Leary, had his head up his ass, and then he continued to complain about O'Leary's decisions relating to the Monticello exercise after being instructed via email and text that he wasn't authorized to speak with the contractors and to bring his complaints to his FEMA chain of command. In October of 2017, during the Puerto Rico deployment, he caused disruptions during meetings. He used profanity, yelled at colleagues, lost his temper with colleagues, and told one younger female supervisor, I have paddled the butts of daughters older than another younger female colleague. And this resulted in the chief of staff of the Puerto Rico mission, Josie Arcurio, releasing him from the Puerto Rico mission. Let's talk about that mission. That situation seemed to deteriorate a lot at that time and place. What accounts for that deterioration if it's not age issues, sex issues? I'm interested in your thoughts on that. Well, I think that in this case that Mr. Ravenhorst was uncomfortable working with or reporting to younger female employees, and that resulted in some friction in the workplace. And also, there's no evidence in the record that Mr. Ravenhorst has presented showing that any of the younger female employees that he claims were incompetent had any bias against older men. There's no comments or declarations from any employee saying that there was a bias against men. And also, Arcurio, who was the chief of staff, who released him because of his conduct there, there's no evidence that she had a bias against men or older workers. Because the only thing that Mr. Ravenhorst points to is the fact that he says that she was a man-hater. But there's no evidence in the record from any other employee in terms of declarations or documents where she's making comments that show that she's a man-hater. This is just his personal subjective belief. To the extent we're looking for some type of objective factors, a lot of those complaints happen within a short period of time, but from different people. Correct. So that could be read one of two ways, right? It could be, but when Mr. Ravenhorst was asked about the events, there's no dispute that he made the comments about paddling the butts of daughters older than younger female colleagues and that he made those comments. And the disputes about how the air operations branch was running in the Puerto Rico mission, he wasn't disciplined because of any competence issues. He was disciplined specifically about his conduct. And there's no dispute that his conduct was abusive, disrespectful, and disruptive. There's no question about his performance at all, right? I know there's a question about the conduct, but the actual job performance he was good at, it seems like, based on what's in the record. Correct. The job performance was good, but whether an employee is meeting the employer's legitimate expectations is not limited solely to the job performance. The civility and decorum, camaraderie in the workplace is also part of the employer's legitimate expectations. And here he was repeatedly counseled, warned, and then reprimanded for engaging in behavior that was not meeting that part of the expectations. For example, in the written reprimands that he received, he was admonished that he was expected to act in a manner that did not reflect negatively on the agency and the federal government, and that he was expected to exercise courtesy and professionalism in his dealings with co-workers, supervisors, and the public. And so this conduct for which he's being reprimanded is not meeting those standards. And based on, you know, FEMA's role is to collaborate with the local officials to prepare and respond to emergencies, and it can't do that if an employee is being removed at the request of the local partner because of his conduct. There's no reasonable fact finder could conclude on these facts that Mr. Ravenhorse was meeting his employer's legitimate expectations. There's the second element of McDonnell Douglas, correct? Correct. Mr. Ravenhorse has not presented any evidence of a discriminatory or retaliatory motive for any of the employment decisions that were made. He was disciplined because of his conduct, and there is no dispute about that, and he has not presented any evidence showing that these employment decisions were made because of his age or his sex or his protected activity. He does point to, he makes the statement that the co-workers and the chief of staff in Puerto Rico had animus against men, but really that's just his personal subjective belief. There's no evidence of that. He hasn't presented any evidence that Mr. O'Leary, the deciding official for the suspension, also had any discriminatory or bias against men either. He points to a November 2017 email that was sent that he says shows that Arcurio, the chief of staff, and O'Leary, his supervisor, had knowledge of his protected activity, but by the time that that email was sent, he had already been released from the Puerto Rico mission, so that could not have influenced Arcurio's decision to release him, and also the supervisor, Mr. O'Leary, had already begun the process of disciplining him in connection with the Monticello exercise in September of 2017 when he contacted an HR specialist. There's also no evidence that Mr. Rabinhorst has presented that showed that similarly situated employees outside of his protected class were treated more favorably. This is the fourth element of McDonnell Douglas. Right. He points to certain female co-workers in Puerto Rico that he claims were incompetent, but he doesn't show that they have engaged in any of the insubordinate or disrespectful conduct that he did or had a similar disciplinary history, and he hasn't identified any employee out of his class who was treated differently. And finally, he has failed to present any evidence from which a reasonable fact finder could conclude that he was subjected to a hostile work environment. The types of events that he's describing don't show a workplace permeated with discriminatory ridicule, intimidation, and insult. The events that occurred in Puerto Rico, there's no evidence that any of those things happened because of his protected class, his age, or his sex, or his protected activity had not yet occurred at that time. And he does point to some events that his supervisor O'Leary rescheduled meetings or changed his work schedule, but O'Leary provided reasons for those changes to his work schedule, not missing meetings, and those had nothing to do with his age, sex, or protected status. So on these facts, a reasonable fact finder could not return a verdict in his favor on his discrimination and retaliation claims. Unless the court has any further questions, we ask the court to affirm the decision of the district court. Thank you, Ms. Phillip. Mr. Smith, we'll move back to you now for rebuttal argument. Mr. Smith, I'd like to focus you in on those second and fourth elements of McDonnell-Douglas, meeting legitimate job expectations, and comparator. Yes, Joe. Well, basically, again, my client was doing his job. He had a job description that was to him by FEMA. Basically, he was doing his job. His job was to protect the country. His job was to make sure that state officials were abiding by the REP program to protect the individual citizens in each of their states. He did it. He did his job. Also, the fact is that the job description is also modified by the fact that he actually is prescribed to do his job by federal statutes, regulations, and policies. I think at this point, he did his job, and sometimes people don't care about following the rules, like O'Leary didn't care about following the rules. And also, O'Leary, by the fact that he didn't follow the rules, he had no disciplinary actions taken against him. As far as the comparable, there were several women that were identified that didn't do their job. He was called in to rectify and try to correct some of the things that were going on. So I think the big thing was O'Leary wasn't doing his job to protect the country by waiving requirements on the preparedness. The females were not doing their job, and they didn't get reprimanded either, where he's called in to help correct the problems to protect Puerto Rico. I think the facts speak well in our statement of facts that he was doing what he's supposed to do. They didn't like that he did what he's supposed to do, and not everybody who works with somebody wants them to abide by the rules, and that's the case here. I think we actually presented a good case of retaliation because he's trying to get O'Leary to do his job. He's making him understand, and O'Leary doesn't want to do it. And based on that, he starts writing him up. They then find different reasons to put small things together and call it conduct. But the conduct is based on somebody not doing their job. It's not somebody just getting up and saying, I don't like you. You're doing a stupid job. He's trying to get people in line. He's trying to get them to respect the law. Thank you, Mr. Smith. Thank you, Ms. Phillip. The case will be taken under advisement. That completes our arguments for the day. Of course, the court will be in recess. Thank you.